# MUTUAL RELEASE AND SETTLEMENT AGREEMENT

KNOW ALL MEN BY THESE PRESENTS:

THIS MUTUAL RELEASE AND SETTLEMENT AGREEMENT ("Release") is made and entered into by and between **LAMAR ADVANTAGE GP COMPANY, LLC, WILLIAM R. WOESSNER, STEVEN M. BROWN, THE TOWNSHIP OF ROBINSON, THE MUNICIPAL AUTHORITY OF THE TOWNSHIP OF ROBINSON, PTM ADVERTISING, LLC, and DODARO, MATTA & CAMBEST, P.C.** (hereinafter the "Parties").

WHEREAS, LAMAR Advantage GP Company, LLC ("Lamar"), William R. Woessner and Steven M. Brown (hereinafter referred to collectively as "Plaintiffs") presented claims against The Township of Robinson and the Municipal Authority of the Township of Robinson (hereinafter referred to collectively as "Defendants") arising out of an incident which occurred on or about June 1, 2020 and thereafter, as more fully described in the Amended Complaint filed by Plaintiffs "**LAMAR ADVANTAGE GP COMPANY LLC, a Delaware Corporation and WILLIAM R. WOESSNER, an individual, and STEVEN M. BROWN, an individual, Plaintiffs, v. THE TOWNSHIP OF ROBINSON and THE MUNICIPAL AUTHORITY OF THE TOWNSHIP OF ROBINSON, Defendants. THE TOWNSHIP OF ROBINSON, as Third-Party Plaintiff, v. PTM ADVERTISING, LLC as Third-Party Defendant and PTM ADVERTISING, LLC as Counter Claimant v. THE TOWNSHIP OF ROBINSON as Counter Defendant**", which action was removed to the United States District Court for the Western District of Pennsylvania, bearing docket number **Civil Action No: 2:21-CV-00183** ("the Lawsuit"); and

WHEREAS, Defendant Township of Robinson caused to be filed in the Lawsuit a Third-party Complaint against PTM Advertising, LLC, which in turn filed a Third-party Counterclaim against Defendant Township of Robinson and further filed a "Motion for Leave to File a Fourth Party Complaint joining Dodaro, Cambest & Associates, P.C. d/b/a Dodaro, Matta & Cambest, P.C."; and

WHEREAS, all parties to the Lawsuit now desire to settle all of the claims which were raised among them in the Lawsuit, including the proposed Fourth Party Complaint attached as an exhibit to  PTM Advertising LLC's Motion at ECF Doc. 63 for Leave to File a Fourth Party Complaint joining Dodaro, Cambest & Associates, P.C. d/b/a Dodaro, Matta & Cambest, P.C. as a Fourth Party Defendant, arising out of the facts and incidents alleged in the Lawsuit, and their aftermath, including any claims that might have been raised, that could be raised, or might otherwise be raised in the future;

NOW THEREFORE, with the foregoing background being incorporated herein by reference, and made part hereof, Plaintiffs, Defendants, PTM Advertising, LLC and Dodaro, Matta & Cambest, P.C., do hereby mutually covenant and agree as follows:

1.      For and in sole consideration of the mutual consideration set forth herein, including both monetary and non-monetary consideration, The Parties agree to release all claims between and among them and against each other and their respective insurance carriers related to the matters raised in the Lawsuit, including but not limited to the following specific claims:

   a.      Plaintiffs agree to release Defendants and their respective insurance carriers from the claims raised in the Amended Complaint;

   b.      Defendant Township of Robinson agrees to release PTM Advertising, LLC from the claims raised in the Third Party Complaint;

   c.      PTM Advertising, LLC agrees to release Defendant Township of Robinson from the claims raised in the Third Party Counterclaim;

   d.      PTM Advertising, LLC agrees to release the law firm of Dodaro, Matta & Cambest, P.C. from the claims that would be raised in the putative Fourth Party Complaint.

2.      All parties do hereby remise, release, and forever discharge, and by these presents, do for themselves, their successors, assigns, heirs, guardians, administrators, executors and all other persons, firms or corporations claiming through them, remise, release, and forever discharge the Defendants, PTM Advertising, LLC, Dodaro, Matta & Cambest, P.C. and their respective insurance carriers,  together with their respective past, present and future officers, directors, elected and appointed officials, attorneys, agents, servants, representatives, employees, predecessors, and successors in interest and assigns, insurers and any and all other persons, firms, or corporations with whom any of the former have been, are now, or may hereafter be affiliated, together with any and all other persons, firms or corporations, of and from any and all past, present, or future claims, demands, obligations, actions, causes of action, rights, damages, costs, counsel fees, expenses, and compensation of any nature whatsoever, whether based on tort, contract or other theories of recovery and whether for compensatory or punitive damages or for equitable relief, which the any party has now or which may hereafter accrue or otherwise be acquired on account of or in any way growing out of the subject of the Claim, including without limitation any and all known or unknown claims for alleged violations of civil or constitutional rights and for injuries or damages to any party and the consequences thereof, which has resulted or may result from the alleged negligent, reckless or intentional acts or omissions of any party or their agents.  This Release, on the part of the parties shall be a fully binding and complete settlement between the parties and all parties represented by or claiming through them.

3.      Plaintiffs shall receive the gross, total **monetary consideration** of TWO HUNDRED TWENTY TWO THOUSAND FOUR HUNDRED FORTY SIX DOLLARS and TEN CENTS ($222,446.10) to be paid to Plaintiffs as follows:

   a) TEN THOUSAND DOLLARS ($10,000.00) by Defendant Municipal Authority of Robinson Township and;

   b) TWO HUNDRED TWELVE THOUSAND FOUR HUNDRED FORTY SIX DOLLARS and TEN CENTS ($212,446.10) by Defendant Township of Robinson.

4.      Each Defendant will be responsible only for its own share of the settlement amount as described in 3(a) and 3(b) above. Should any Defendant default on its obligation, the Plaintiffs' sole recourse will be against the defaulting Defendant.

5.      This Release further incorporates additional terms for non-monetary consideration, which are set forth in Exhibit "A" and Exhibit "B" attached hereto and intended by the parties to be considered as part of the mutual consideration for this Release and Settlement Agreement.

6.      The parties acknowledge that they have received no advice or representation of any kind from any other party, their attorneys or representatives with respect to whether any portion of the settlement fund might be subject to taxation.  In the event that it should be determined by any governmental taxing authority or by a court of law that any portion of the monetary consideration for this release is subject to taxation, the parties shall in that event bear the entire cost of satisfying the tax liability that is assigned respectively to each.

7.      The parties shall bear their own respective attorneys' fees and costs arising from this action or the actions of respective counsel in connection with this matter, this Release and Settlement Agreement and the matters and documents referred to herein, and all matters related to the investigation and litigation of the Plaintiff's claims.

8.      Upon payment of the monetary consideration set forth in Paragraph **3** hereof, all parties shall direct their counsel of record to execute a stipulation to be filed with the United States District Court for the purpose of securing an order dismissing the Lawsuit with prejudice.

9.      The Parties hereby acknowledge and agree that this Release agreement is a General Release, and they further expressly waive and assume the risk that claims for damages may exist as of this date, which they do not know of or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise and which, if known, would materially affect their decision to enter into this Release and Settlement Agreement.  The Parties further agree that they have accepted payment of the sums specified herein as a complete compromise of matters involving disputed issues of law and fact, and they each fully assume the risk that the facts or the law may be otherwise than they believe.

10.     The Parties agree and acknowledge that they accept exchange of the consideration specified in this Release and Settlement Agreement as a full and complete compromise of matters involving disputed issues; that the Defendants, PTM Advertising, LLC, and Dodaro, Matta & Cambest, P.C. further deny and continue to deny liability to any other party with respect to the claims raised in the Lawsuit, and neither delivery of the consideration on behalf of a party nor the negotiations for this settlement by the parties or their attorneys or representatives shall be construed or considered as admissions of liability by any of the said parties, and that no past or present wrongdoing on the part of any party or its agents shall be implied by such payment, delivery or negotiations.

11.     The parties represent and warrant that each retains its own responsibility for payment of any and all bills, costs or liens pending against them or which may be assessed against them in the future arising from the transactions which are the subject of the Lawsuit, including the costs of litigation.  All parties shall bear their own costs and fees incurred for the prosecution or defense of this matter.

12.     Plaintiffs and PTM Advertising, LLC agree that neither they nor their  attorneys or other representatives, or any persons or entities acting on their behalf, will publicize, disseminate or post or cause to be publicized, disseminated or posted any information about this settlement agreement and release in any news or communications media, including but not limited to newspapers, magazines, journals, radio, television, blogs, websites, chat rooms, internet forums, social networking websites or other social media. The Plaintiff hereto expressly agrees that if otherwise asked about the disposition of the lawsuit, he shall say in words or substance, that it was resolved to the mutual satisfaction of the parties. The parties hereto understand and agree that Defendants/Releasees shall maintain the same confidentiality regarding this settlement agreement and release, subject to those exceptions arising out of compliance with Pennsylvania's Sunshine Act, the Right-to-Know Act or other applicable state or federal law.

13.     This Release and Settlement Agreement, including Exhibits "A" and B", contains the entire agreement between the Parties with regard to the matters set forth in it and shall be binding upon and inure to the benefit of the executors, administrators, personal representatives, heirs, insurers, successors, and assigns of each.   There are no other understandings or agreements, verbal or otherwise, in relation thereto, between the Parties.

14.     In entering into this Release, the Parties represent that they have relied upon the legal advice of their own counsel, and that the terms of this Release and Settlement Agreement have been completely read and explained and that those terms are understood and voluntarily accepted.

15.     This Release has been entered into within the Commonwealth of Pennsylvania, and shall be construed and interpreted in accordance with its laws.

16.     The Parties, intending to be legally bound by the terms of this Release and Settlement Agreement, have caused their hands and seals or those of their authorized representatives to be set hereunto on the dates indicated below. This Release may be executed by the Parties in separate counterparts.

**CAUTION:  READ BEFORE SIGNING.**

**THIS IS A RELEASE OF LEGAL CLAIMS.**

WITNESS

DATE

WITNESS

12 / 15 / 23

DATE

William R. Woessner

WITNESS

12 / 5 / 2023

DATE

WITNESS

DATE

WITNESS

DATE

**For LAMAR ADVANTAGE GP COMPANY LLC, a Delaware Corporation**

WILLIAM R. WOESSNER

STEVEN M. BROWN

REPRESENTATIVE OF THE TOWNSHIP OF ROBINSON

REPRESENTATIVE OF PTM ADVERTISING, LLC.

_Larissa Simko_
**WITNESS**

_____
**For LAMAR ADVANTAGE GP**
**COMPANY LLC, a Delaware Corporation**

12-4-2023
**DATE**

_____
**WITNESS**

_____
**WILLIAM R. WOESSNER**

_____
**DATE**

_____
**WITNESS**

_____
**STEVEN M. BROWN**

_____
**DATE**

_____
**WITNESS**

_____
**REPRESENTATIVE OF THE**
**TOWNSHIP OF ROBINSON**

_____
**DATE**

_____
**WITNESS**

_____
**REPRESENTATIVE OF PTM**
**ADVERTISING, LLC.**

_____
**DATE**

WITNESS _____

For LAMAR ADVANTAGE GP
COMPANY LLC, a Delaware Corporation

DATE _____

WITNESS _____

WILLIAM R. WOESSNER

DATE _____

WITNESS _____

STEVEN M. BROWN

DATE _____

WITNESS _____

REPRESENTATIVE OF THE
TOWNSHIP OF ROBINSON

DATE _____

WITNESS _____

REPRESENTATIVE OF PTM
ADVERTISING, LLC.

DATE  12-29-23

_____

WITNESS                                    WILLIAM R. WOESSNER


_____

DATE


_____

WITNESS                                    STEVEN M. BROWN


_____

DATE


_____

WITNESS          REPRESENTATIVE OF THE TOWNSHIP OF ROBINSON


_____

DATE


_____

WITNESS                                    REPRESENTATIVE OF PTM
                                           ADVERTISING, LLC.


_____

DATE


_____

WITNESS                                    REPRESENTATIVE OF THE
                                           MUNICIPAL AUTHORITY OF THE
                                           TOWNSHIP OF ROBINSON

_____

DATE

_____

**WITNESS**

**REPRESENTATIVE OF DODARO,**

**MATTA & CAMBEST**

Jan. 3, 2024
_____
**DATE**

Page 1 of 6

_____
**WITNESS**


_____
**DATE**



_____
**WITNESS**



_____
**DATE**

_____
**REPRESENTATIVE OF THE**
**MUNICIPAL AUTHORITY OF THE**
**TOWNSHIP OF ROBINSON**



_____
**REPRESENTATIVE OF DODARO,**
**MATTA & CAMBEST**

**LAMAR ADVANTAGE GP COMPANY LLC, A DELAWARE CORPORATION AND WILLIAM R. WOESSNER, AN INDIVIDUAL, AND STEVEN M. BROWN, AN INDIVIDUAL, PLAINTIFFS, V. THE TOWNSHIP OF ROBINSON AND THE MUNICIPAL AUTHORITY OF THE TOWNSHIP OF ROBINSON, DEFENDANTS. THE TOWNSHIP OF ROBINSON, THIRD-PARTY PLAINTIFF, V. PTM ADVERTISING, LLC, THIRD-PARTY DEFENDANT**

## CIVIL ACTION NO: 2:21-CV-00183

## EXHIBIT 'A' TO RELEASE AND SETTLEMENT AGREEMENT

The following terms and conditions are specific to Plaintiffs and Robinson Township (hereafter the "Township") and should be interpreted consistently with the terms and conditions of EXHIBIT "B", as follows:

1.  The Township shall pay the cost to remove the current      sign located at Robinson Town Center and Park Manor Blvd (40.455993, -80.167467). (hereinafter referred to as the "Mall Sign"), leaving the base and pole standing.

    (a)  Lamar shall have 30 months from the date of the execution of the Release and Settlement Agreement to determine if it is interested in applying for a building permit to replace the mall sign.

        (i)  The proposed new mall signs must   be equal to   the   existing digital signage but in no case greater than 768 square feet total for both sign faces and/or meet all requirements of Robinson Township Billboard Ordinances with the exception of the conditional use process and zoning and spacing criteria, if applicable.

    (b)  It is left to Lamar's discretion as to whether it will utilize the existing base and pole or to replace these components.

    (c)  If Lamar determines not to apply for a building permit, Lamar shall be responsible for the removal of the base and pole as soon as      practical after the expiration of the 30 month time period and in no event longer than 45 days after the expiration of the 30 month time period.

2.  Should Lamar proceed to submit an application for a building permit for the purpose of installing a new mall sign at the same site as the currently existing sign and the Township to approve the permit, the Township and Lamar shall enter into an Agreement with the same price terms as are contained in the Township's current agreement with PTM, dated August 3, 2017. The new agreement is      attached hereto and marked as Exhibit "A-1".

3.  Lamar shall have the option for a period of 24 months from the execution of this Settlement Agreement to apply for building permits to erect digital and /or static signs in up to three (3) additional locations within the Township in the areas identified in Exhibit "A-2" which is attached hereto and incorporated herein.  Should any signs be erected within Robinson

Township Right-of-Ways, the Parties shall execute an Agreement with the same terms and conditions as outlined in Exhibit A-1.

    (a)      All signs proposed at the additional locations must meet all requirements of Robinson Township Billboard Ordinances with the exception of the conditional use process and zoning and spacing criteria, if applicable.

4.       At the expiration of the Agreement between the Township and Lamar, dated June 26, 2017, pertaining to transit     shelters with advertising, the Township agrees to extend the current Agreement that is due expire o    n June 25, 2032 for              an additional ten (10) year time period from      June 26, 2032     to June 25, 2042              under the same terms and conditions except for the following:

    (a)      Lamar agrees to amend paragraph 2 of the Agreement to provide that Lamar shall pay to the Township 9%-12% as stated in the Agreement between Lamar and the Township dated June 26, 2017     , 2017. *See* Exhibit "A-2      "

**END OF EXHIBIT "A"**

**THE**  *LAMAR*  **COMPANIES**

Lamar Co #

This Instrument Prepared by:
    James R. McIlwain
    5321 Corporate Boulevard
    Baton Rouge, Louisiana 70808

_____ New
_____ Renewal
_____ Lease #

_____
    James R. McIlwain

# SIGN LOCATION LEASE

THIS LEASE AGREEMENT, made this _____ day of _____, 20_____, by and between:

**THE TOWNSHIP OF ROBINSON** (hereinafter referred to as "Lessor") and **THE LAMAR COMPANIES** (hereinafter referred to as "Lessee"), provides

# WITNESSETH

"**LESSOR** hereby leases to **LESSEE**, its successors or assigns, as much of the hereinafter described lease premises as may be necessary for the construction, repair and relocation of an outdoor advertising structure ("sign"), including necessary structures, advertising devices, utility service, power poles, communications devices and connections, with the right of access to and egress from the sign by **LESSEE'S** employees, contractors, agents and vehicles and the right to survey, post, illuminate and maintain advertisements on the sign, and to modify the sign to have as many advertising faces, including changeable copy faces or electronic faces, as are allowed by local and state law, and to maintain telecommunications devices or other activities necessary or useful in **LESSEE'S** use of the sign. Any discrepancies or errors in the location and orientation of the sign are deemed waived by **LESSOR** upon **LESSOR'S** acceptance of the first rental payment due after the construction of the sign.

The premises are a portion of the property located in the County of Allegheny, State of Pennsylvania, more particularly described as:

**(legal description may be included here or referenced as Exhibit A, which description should also include a sketch or more detailed survey of the location of the sign on the LESSOR'S property)**

1.    This Lease shall be for a term of **fifteen (15) years** commencing on the first day of the calendar month following the date of completion of construction of the sign, or, if this is a renewal Lease, the term and payments begin _____ ("commencement date"). **LESSEE** may renew this Lease for an additional term of five (5) years, on the same terms and conditions but paying the rental listed herein ("renewal term"). Said renewal term shall automatically go into effect unless **LESSEE** shall give to **LESSOR** written notice of non-renewal at least sixty (60) days prior to the expiration of the original term. Upon expiration of the initial term and any renewal term of this Lease, this Lease shall automatically renew and continue from year to year, on the same terms and conditions contained herein, unless either party shall provide to the other party written notice of non-renewal at least sixty (60) days prior to the expiration of the then-current term.

2.    **LESSEE** shall pay to **LESSOR** an annual rental which is equal to nine percent (9%) of the net annual revenue generated by the advertising sales on the sign ("Percentage Rent") for years one through fifteen. (Net annual revenue shall be defined as total sales revenue minus any and all expenses). Following the Original Term (15 years) and during the Renewal Term (5 years, years 16-20), **LESSEE** shall pay to **LESSOR** an annual rental which is equal to twelve percent (12%) of the net annual revenue generated by advertising on the sign. At the conclusion of the initial year of the lease, being defined as one year after the commencement date of the lease ("lease year") and for each lease year thereafter, **LESSEE** shall provide **LESSOR** an accounting of the total revenues generated through advertising on the sign along with any and all expenses deducted, and within 30 days

after the conclusion of each lease year issue a payment for the percentage rent. **LESSEE** shall pay to the **LESSOR** Rent shall be considered tendered upon due mailing or attempted hand delivery during reasonable business hours at the address designated by **LESSOR**, whether or not actually received by **LESSOR**. Should **LESSEE** fail to pay rent or perform any other obligation under this lease within thirty (30) days after such performance is due, **LESSEE** will be in default under the lease. In the event of such default, **LESSOR** must give **LESSEE** written notice by certified mail and allow **LESSEE** thirty (30) days thereafter to cure any default.

3.     **LESSOR** agrees not to erect or allow any other off-premise advertising structure(s), other than **LESSEE'S**, on property owned or controlled by **LESSOR** within two thousand (2000) feet of **LESSEE'S** sign. **LESSOR** further agrees not to erect or allow any other obstruction of highway view or any vegetation that may obstruct the highway view of **LESSEE'S** sign. **LESSEE** is hereby authorized to remove any such other advertising structure, obstruction or vegetation at **LESSEE'S** option.

4.     **LESSEE** may terminate this lease upon giving thirty (30) days written notice in the event that the sign becomes entirely or partially obstructed in any way or in **LESSEE'S** opinion the location becomes economically or otherwise undesirable. If **LESSEE** is prevented from constructing or maintaining a sign at the premises by reason of any final governmental law, regulation, subdivision or building restriction, order or other action, **LESSEE** may elect to terminate this lease. In the event of termination of this Lease prior to expiration, **LESSOR** will return to **LESSEE** any unearned rentals on a pro rata basis.

5.     All structures, equipment and materials placed upon the premises by the **LESSEE** or its predecessor shall remain the property of **LESSEE** and may be removed by **LESSEE** at any time prior to or within a reasonable time after expiration of the term hereof or any renewal. At the termination of this lease, **LESSEE** agrees to restore the surface of the premises to its original condition. The **LESSEE** shall have the right to make any necessary applications with, and obtain permits from, governmental bodies for the construction and maintenance of **LESSEE'S** sign, at the sole discretion of **LESSEE**. All such permits and any nonconforming rights pertaining to the premises shall be the property of **LESSEE**.

6.     **LESSOR** represents that he is the owner or lessee under written lease of the premises and has the right to make this agreement and to grant **LESSEE** free access to the premises to perform all acts necessary to exercise its rights pursuant to this lease. **LESSOR** is not aware of any recorded or unrecorded rights, servitudes, easements, subdivision or building restrictions, or agreements affecting the premises that prohibit the erection, posting, painting, illumination or maintenance of the sign. **LESSOR** acknowledges that the terms and conditions of this agreement are confidential and proprietary and shall not be disclosed to any third-party without the written consent of **LESSEE**.

7.     In the event of any change of ownership of the property herein leased, **LESSOR** agrees to notify **LESSEE** promptly of the name, address, and phone number of the new owner, and **LESSOR** further agrees to give the new owner formal written notice of the existence of this lease and to deliver a copy thereof to such new owner at or before closing. In the event that **LESSEE** assigns this lease, the assignee will be fully obligated under this Lease and **LESSEE** will no longer be bound by the lease. This lease is binding upon the personal representatives, heirs, executors, successors, and assigns of both **LESSEE** and **LESSOR**.

8.     In the event of condemnation of the subject premises or any part thereof by proper authorities, or relocation of the highway, the **LESSOR** grants to the **LESSEE** the right to relocate its sign on **LESSOR'S** remaining property adjoining the condemned property or the relocated highway. Any condemnation award for **LESSEE'S** property shall accrue to **LESSEE**.

9.     **LESSEE** agrees to indemnify **LESSOR** from all claims of injury and damages to **LESSOR** or third parties caused by the installation, operation, maintenance, or dismantling of **LESSEE'S** sign during the term of this lease. **LESSEE** further agrees to repair any damage to the premises or property at the premises resulting from the installation, operation, maintenance, or dismantling of the sign, less ordinary wear and tear.

10.    **LESSOR** agrees to indemnify **LESSEE** from any and all damages, liability, costs and expenses, including attorney's fees, resulting from any inaccuracy in or nonfulfillment of any representation, warranty or obligation of **LESSOR** herein.

11.    **LESSEE** shall have the right of first refusal to meet any bona fide offer from a third party for the purchase for an easement involving this sign and/or lease on the same terms and conditions of such offer. Upon **LESSEE'S** failure to meet such offer in writing within thirty (30) days after written notice thereof from **LESSOR**, **LESSOR** may sell the easement to the third party in accordance with his offer.

12.    If required by **LESSEE**, **LESSOR** will execute and acknowledge a memorandum of lease suitable for recordation. In addition to the foregoing, **LESSOR** authorizes and appoints **LESSEE** as **LESSOR'S** agent, representative, and attorney in fact for the limited purpose of executing on behalf of **LESSOR** such memorandum of lease and any amended memorandum of lease that are necessary or desirable to correct, amend, or supplement any matter set forth in such memorandum. **LESSOR** further authorizes **LESSEE** to perform all acts that are incidental to or necessary for the execution and recordation of such memorandum or memoranda.

13.    This Lease is **NOT BINDING UNTIL ACCEPTED** by the General Manager of a Lamar Advertising Company.

**THE LAMAR COMPANIES, LESSEE:**                     **LESSOR:**

**BY:** _____              **BY:** _____

**DATE:**      /       /                              **DATE:**       /        /

                                                      _____
                                                      LESSOR'S TELEPHONE NUMBER

                                                      _____
                                                      LESSOR'S SOCIAL SECURITY NUMBER

                                                      _____
                                                      Tax ID Parcel # (for land on which sign is located)

_____                      LESSOR'S SOCIAL SECURITY NUMBER

**Address of LESSEE:**                                **Address of LESSOR:**

740 Trumbull Drive
Pittsburgh, Pa 15205

Witnesses (**LESSEE**)                               Witnesses (**LESSOR**)

_____                      _____

**LAMAR ADVANTAGE GP COMPANY LLC, A DELAWARE CORPORATION AND WILLIAM R. WOESSNER, AN INDIVIDUAL, AND STEVEN M. BROWN, AN INDIVIDUAL, PLAINTIFFS, V. THE TOWNSHIP OF ROBINSON AND THE MUNICIPAL AUTHORITY OF THE TOWNSHIP OF ROBINSON, DEFENDANTS. THE TOWNSHIP OF ROBINSON, THIRD-PARTY PLAINTIFF, V. PTM ADVERTISING, LLC, THIRD-PARTY DEFENDANT**

## CIVIL ACTION NO: 2:21-CV-00183

## EXHIBIT 'B' TO RELEASE AND SETTLEMENT AGREEMENT

The following terms and conditions are specific to PTM Advertising, LLC (hereafter "PTM") and Robinson Township (hereafter the "Township") and should be interpreted consistently with the terms and conditions of EXHIBIT "A", as follows:

1.  PTM shall be permitted to continue to utilize the mall sign for a period of 30 months from the date of execution of the Release and Settlement Agreement.

2.  PTM agrees to pay the cost to move the Clever Road sign from its current location to a new location somewhere within the intersection of Clever Road and Aiken Road Extension at an exact location to be determined and that will afford access to electrical power and be viewed by motorists passing by. The Clever Road sign must be moved from its current location to a new location within 60 days of the date of the execution of the Release and Settlement Agreement.

    (a)  If it is not feasible to move the sign completely from its current location in the time allotted then it must be disabled from operation within 60 days of the execution of the Release and Settlement Agreement until such time as it can be moved.

    (b)  The Township shall retain the base for the sign.

3.  The Township shall amend the current Lease Agreement to provide for the automatic extension of the current Lease as identified in paragraph 1.3 of the current Lease Agreement.

4.  The Township will waive the nine (9%) percent fee owed the Township (not already paid) until January 1, 2024. An audit shall be performed and completed within sixty (60) days by an independent auditor with the cost to be shared by PTM and the Township.

5.  The Township agrees to enter into an Option Agreement to provide PTM with an option to purchase all current signs (except the Mall sign) subject to the following:

    a.  If PTM exercises its option and keeps the signs at their current locations (except the Mall sign) PTM will continue to pay to Township the current lease fee as set forth in the current Lease Agreement, including the Mall sign. PTM agrees to continue to place municipal messages on the signs, a percentage of it to be determined by the parties.

1

      b.      If PTM exercises its option and removes the signs from their current locations, the Township, agrees to take the necessary action to terminate the current Lease Agreement subject to the provisions of the current Lease.

6.      PTM agrees that it will not erect any type of electronic billboard/outdoor advertising signage in any other municipality without first complying with all zoning regulations of the municipality where PTM seeks to erect such a sign.

**END OF EXHIBIT "B"**

https://dodaromattaandcambest.sharepoint.com/sites/dodaromattacambest/dmc_law/02_clients/municipalities/robinson_robin/robin-8120_sign welcome to robinson township/draft_changes to lease agreement 09282023.docx

2

**Agreement Between**
**Township of Robinson**
**and**
**Lamar Advertising of Penn, L.L.C. d/b/a Lamar Advertising of Pittsburgh**
**to**
**Provide Transit Shelters with Advertising**

This CONTRACT is made and entered into this 26th day of June , 2017, by and between the Township of Robinson organized and existing under the laws of the State of Pennsylvania (hereinafter referred to as the "TOWNSHIP"), and Lamar Advertising of Penn, L.L.C. d/b/a Lamar Advertising of Pittsburgh, a company authorized to do business in the State of Pennsylvania, (the "COMPANY") and subject to the COMPANY'S compliance with the requirements of the TOWNSHIP.

1.  GRANT OF RIGHT. The TOWNSHIP hereby grants the COMPANY, for the term herein described, the right to construct, erect, install, repair, and maintain shelters at bus stop locations, throughout the TOWNSHIP, subject to the COMPANY mutually agreeing to each said location and subject to the COMPANY'S compliance with the requirements of the TOWNSHIP. The right is intended to include both existing bus stops and those agreed upon by the TOWNSHIP and the COMPANY at any time during the term hereof. The TOWNSHIP shall not be required to grant permission to construct, erect, or install a bus shelter on a utility easement unless additional easement(s) is obtained from the property owner to allow sufficient access for utility maintenance as determined by the TOWNSHIP. However, where the right to erect shelters is governed by the County, or State regulations with reference to right-of-way considerations outside the jurisdiction of the TOWNSHIP, the COMPANY shall be solely responsible for obtaining any and all clearances for placement of shelters. In the event a location is on a State road, the TOWNSHIP will cooperate with the COMPANY in making application to the State for permit to erect bus shelters on the right-of-way. This agreement shall be without prejudice to the TOWNSHIP'S right to increase, decrease or otherwise adjust or terminate the level and routes of its service to the riding public, and COMPANY acknowledges that the TOWNSHIP shall have the right to so alter its service without any penalty except its share of any resulting loss of customer advertising contract revenue.

2.  BUS SHELTER FEES PAYABLE TO TOWNSHIP. In consideration of the exclusive right granted for the use of TOWNSHIP/County property, the use of sidewalks, and other specific property uses allowed by the TOWNSHIP/County, the COMPANY agrees to perform the following:
    $900 per shelter, per year annual cash guarantee, years 16-30
    Percentage of revenue equaling 15% of collected revenue if greater than annual cash guarantee
    Non-financial assistance in the form of poster rental space

3.  DUTIES AND OBLIGATIONS OF THE COMPANY. The COMPANY shall comply with all terms and conditions of this contract and the TOWNSHIP and County License Agreements and will undertake each of the following at its sole expense with respect to the erection of shelters at various bus stop locations throughout the TOWNSHIP service area, as directed by the TOWNSHIP:

    a)  TECHNICAL CODES

        To erect such shelters in conformance with the Building Code, approved by the TOWNSHIP Engineer, and other applicable technical codes and to use the types of material and in accordance with the plans and specifications set forth in specifications attached hereto and made a part hereof or alternate plans agreed upon by both parties.

    b)  INSPECTION

        To inspect, clean, repair, and otherwise maintain the shelters as necessary. Safety issues related to broken glass shall be given top priority with a clean up response within 24 hours. Graffiti removal will also be addressed with 24 hours of notification by the TOWNSHIP. Failure to maintain a shelter may result in the

TOWNSHIP taking action to maintain the shelter and back charge the COMPANY for verified expenses incurred by the TOWNSHIP.

c)   ILLUMINATION

The COMPANY may illuminate the advertising display unit of shelters agreed upon by the COMPANY and the TOWNSHIP. The COMPANY will be responsible for bills resulting from illumination. The TOWNSHIP will assist the COMPANY by allowing the COMPANY to hook into an electrical source provided by the TOWNSHIP, however, the COMPANY will be responsible for the cost of all connections and electricity used.

d)   INSURANCE

COMPANY shall procure and maintain for the duration of the contract insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the work hereunder by the COMPANY, its agents, representatives, employees or subcontractors for the duration of this contract.

1.   COMPANY shall maintain no limits less than:
   a) Commercial General Liability: $1 million combined single life per occurrence for bodily injury, personal injury and property damage (or higher limits depending on size of contract.)

   b) Automobile Liability

e)   ADVERTISING

The COMPANY must ensure that only displays of a high quality standard with regard to artwork and advertising content will be shown. The COMPANY must also ensure the following:
1.   Advertisements shall be of a reputable character, shall conform to recognized business standards and shall not conflict with the laws of the United States or any state or political subdivision thereof.
2.   Graphics, artwork, and copy of the advertisements are expected to be of high quality and good taste.
3.   Vulgar, disreputable or other advertisements that may be offensive to the public shall not be acceptable.
4.   Advertising of liquor and gaming will be allowed; however, it will not be placed within 500 feet (500') of a church, school, synagogue, or playground.
5.   All advertising shall be displayed in a neat and workmanlike manner.
6.   The COMPANY shall maintain all displayed advertising so as to ensure its neat appearance and promptly remove all advertising which is torn or is otherwise unsightly in appearance.
7.   The TOWNSHIP reserves the right to require the COMPANY to promptly remove, at the COMPANY's expense, any advertising, which in the opinion of the TOWNSHIP, is unsightly in appearance or socially or morally offensive.
8.   The COMPANY further agrees to remove dated advertising no later than fifteen (15) days following the final date of an advertised event or offer.
9.   No advertising shall be designed as to cause or create a safety hazard.

f)   SURFACE RESTORATION AND LANDSCAPING

The COMPANY shall repair to original condition or replace all structures or facilities on public or private property, which may have been damaged during construction operation or removal of bus shelters either owned by the COMPANY or the TOWNSHIP, if the COMPANY has performed such construction. The

works shall include but not be limited to sidewalks, driveways, posts, poles, walls, fences, gates, footing, trees, shrubs, lawns sprinklers, curbs, gutters, utilities, (both overhead and underground), manholes, catch basins, inlets, parkways, parkway drains, street surfaces, and landscaping in the parkway areas. The work shall include furnishing and re-placing planting soils, trees, shrubs, grass, sod and other ground over planting as required to conform to the original surface condition and cross section as specified, and clean up and removal of all surplus materials, rubbish and trash of every nature remaining after the construction has been completed. The COMPANY further agrees to repair or replace public or private property in a manner acceptable to the TOWNSHIP. All repairs shall incorporate materials and methods similar to those used in the original structure, unless otherwise specified.

4. INDEMNIFICATION. The COMPANY shall defend, indemnify and save the TOWNSHIP, its officials and employees harmless from and against any and all claims, liabilities, losses, actions, damages, and causes of action including reasonable attorney's fees, and will on account of and on behalf of the TOWNSHIP defend any and all claims, actions, demands, suits, which may arise out of the COMPANY's activities under this Contract, whether the Contract or in tort, in law or in equity, including all other acts or omissions to act on the part of the COMPANY, including any employee acting on the COMPANY's behalf. The COMPANY shall pay claims and losses under this Contract and shall defend all suits in the name of the TOWNSHIP, its officials and/or employees and shall pay all costs and judgements, which may issue thereon.

5. INSTALLATION OF SHELTERS. The COMPANY agrees to install shelters at various locations during the first 12 months of this contract (subject to all permitting requirements). Additional units may be installed if mutually agreed upon by both the TOWNSHIP and the COMPANY. The TOWNSHIP requires that the COMPANY submit, in writing 60 working days after execution of this contract, a proposed number of shelter locations agreed upon by the TOWNSHIP, municipality and COMPANY.

The TOWNSHIP further reserves the right to withhold its approval as to the installation of shelters at particular locations, and if the TOWNSHIP should determine in its sole discretion, that the proposed locations are unsuitable, due to traffic flow hazard, then the parties shall mutually agree upon an alternative locations (s). The TOWNSHIP shall be deemed to have approved the locations for bus shelters if the TOWNSHIP does not disapprove, in written, on such locations within 15 days of TOWNSHIP's receipt of COMPANY's written declaration of such locations. All bus shelters installed during the term of the Contract shall be installed and maintained in accordance with the requirements of all applicable building codes of the municipality governing the location. The TOWNSHIP will grant the COMPANY the first right of refusal to install transit shelters on TOWNSHIP owned property, including Park and Ride lots and rail stations under the same terms herein.

6. CONTINUING MAINTENANCE OBLIGATION. The COMPANY shall maintain all the shelters, which it erects or places at agreed upon locations. The COMPANY shall clean ten (10) feet away from each side of the shelter, all trash and debris within the public right-of-way including curb and gutter in compliance with the TOWNSHIP sidewalk ordinance. The trash shall be removed bimonthly from the public right-of-way or as needed. COMPANY shall also keep shelters and the area around them free and clear of debris including snow, ice, etc. Further, the COMPANY shall be responsible for the cleaning, repairing or replacement of all bus shelter parts, including advertising material, signs and visual displays placed upon the shelters. However, the COMPANY shall not be responsible for the maintenance or repair of any sidewalks, walkways, or curbs to which the shelters are attached, unless such sidewalk, walkways, or curbs shall have been damaged through the acts or omission of the COMPANY, its agents, subcontractors, or employees, except for those portions of the sidewalks, walkways, or curbs, located within the shelters themselves, which the COMPANY shall be responsible for maintaining at its own cost and expense. In the event a shelter is not maintained in good repair and in clean condition as determined by the TOWNSHIP, the TOWNSHIP, shall notify the COMPANY in writing and repairs will commence per this agreement. If the condition is not corrected to the TOWNSHIP's satisfaction within five (5) working days after the date of the notice, the TOWNSHIP shall have the right and privilege to repair said shelter and otherwise correct the deficiency and charge the COMPANY for the costs of such repair (inclusive of personnel expense, labor, and materials) or the corrective action taken. In order to minimize any liability, the COMPANY agrees to remove or repair damage shelters within five (5) days of accident or damage which creates a hazardous condition for the public at large.

7.  **RIGHT OF COMPANY TO REMOVE INDIVIDUAL SHELTERS.** Except as provided for in this Section, The COMPANY shall not remove any shelters installed at a bus stop location during the term of this Contract without first having obtained written consent of the TOWNSHIP. It is agreed, however, that the COMPANY shall have the right to remove individual shelters (after ten (10) days written notice to the TOWNSHIP) without seeking prior approval from the TOWNSHIP in the event that such shelters have been subjected to "chronic vandalism". For purposes hereof, the phrase: "chronic vandalism" shall be defined as damages inflicted to an individual shelter during any three (3) consecutive month period which require cumulative expenditures and repair that exceed $600.00

8.  **RELOCATION OF SHELTERS.** In the event of a change in bus stop or other transportation system designations, changes in street design or rights-of-way or changes the TOWNSHIP deems necessary for the public health, safety, welfare and convenience, or changes in demographics which materially affect the pedestrian vehicular traffic flow at or near shelters established in connection herewith, the COMPANY, at the TOWNSHIP's written request, shall relocate a designated shelter to another location mutually agreed to by the TOWNSHIP and the COMPANY. NOTE: If requested by the TOWNSHIP, a shelter must be removed even if the TOWNSHIP and COMPANY cannot agree on a new site. Any shelter removal must be approved by the TOWNSHIP.

    The expense in connection with such relocation shall be borne by the COMPANY, and the COMPANY shall act expeditiously in order to relocate such shelters. In the event that a change of street design or right-of-way location shall require the relocation of a shelter, the COMPANY shall coordinate its work with the contractors or other personnel performing labor in connection with the change of street design or right-of-way location in order to accomplish the relocation of shelters on street right-of-ways. The TOWNSHIP shall incur no liability in the event of any closure or relocation of any road, or of the changing of any traffic pattern or bus route other than loss of revenue derived from the removed shelter.

9.  **COMMUNITY SERVICE.** The COMPANY shall provide the advertisement boxes for the TOWNSHIP sponsored advertising messages on a space available basis. In no event shall a paying customer be removed from an ad space that the TOWNSHIP wants to utilize for TOWNSHIP messages. The TOWNSHIP shall be responsible for supplying all necessary ad materials. The COMPANY, however, will install at no cost to the TOWNSHIP, such public advertisements.

10. **TERMS OF THE CONTRACT.** This contract shall become effective upon execution by the parties hereto and shall remain in full force and effect for a period of five (5) years beginning with the actual date the Contract is signed by the TOWNSHIP. Upon completion of the initial term, the contract shall be renewed for two additional five (5) year periods, provided the COMPANY nor the TOWNSHIP have been found in default of this agreement and provided its terms and conditions are finalized no later than 120 prior to the expiration of the initial term.

11. **TERMINATION RIGHT OF THE TOWNSHIP.** Notwithstanding anything contained elsewhere herein, the TOWNSHIP shall have the unilateral right to cancel and terminate this Contract in the event that the COMPANY becomes insolvent or if the COMPANY commits an act of bankruptcy or for the appointment of a receiver, of if there commences proceedings under any law relating to bankruptcy, insolvency, reorganization, or relief for the COMPANY's obligations and which proceedings are not withdrawn or dismissed within ninety (90) days after the commencement or if the COMPANY dissolves itself. In such event, the COMPANY shall have the absolute right and responsibility to remove existing shelters pursuant to the provision of Section 3(f) hereof.

12. **TERMINATION FOR CAUSE.** Subject to the force majeure provision set forth herein, neither party shall terminate or cancel the Contract, whether by court action or otherwise, unless there is a Material Default by the other party. For purposes of the Contract, a Material Default shall be any monetary default not cured by the COMPANY within fifteen (15) days of receipt of notice from the TOWNSHIP and any non-monetary default by a party not cured by such party within thirty (30) days of receipt of notice by the non-defaulting party of such default unless default is attributable to an event of force majeure or unless it is not reasonably possible for the defaulting party, in which case the defaulting party shall have such amount of time as is reasonable necessary to cure such default. In the event that the TOWNSHIP feels that the COMPANY is not curing the

default within a reasonable time. The TOWNSHIP may file a lawsuit seeking any and all remedies available to the TOWNSHIP at law or in equity. Neither party shall be obligated to perform and neither shall be deemed to be in Material Default hereunder if performance of a non-monetary obligation is prevented by the occurrence of any of the following (herein called "force majeure" or "event of force majeure") acts of God, strikes, lockouts, other industrial disturbances, acts of the public enemy, laws, rules and regulations of applicable governmental bodies, wars or warlike action (whether actual, impending, or expected and whether de jure or de factor), arrest or other restraint of government (civil or military), blockades, insurrections, riots, epidemics, landslides, earthquakes, fires, hurricanes, storms, floods, washouts, civil disturbances, explosions, nuclear reaction or radiation, radioactive contamination, or any other causes whether for the kind herein enumerated or otherwise, that are not reasonably within the control of the party claiming the right of delay performance on account of such occurrence. The termination of the Contract my become effective, at the discretion of the non-defaulting party, fifteen (15) days from the required date, as more specifically described herein, for the material default to be cured.

13. OBTAINING NECESSARY APPROVALS. The COMPANY shall obtain any and all necessary TOWNSHIP, County, and State approvals or licenses of any kind that might be required as a condition of installing the proposed shelters at bus stop locations. The TOWNSHIP agrees that if there are state licenses or permits that can be obtained only by the TOWNSHIP as a public entity, the TOWNSHIP will cooperate with COMPANY in obtaining such licenses or permits, with the understanding that COMPANY will handle as much of the permitting or licensing as possible. The cost of obtaining any such permits shall be borne by the COMPANY. The COMPANY shall not be charged for any required TOWNSHIP or County bus shelter permits, whether at the time of erection or on an annual renewal basis. The TOWNSHIP shall work with the COMPANY to help insure that illumination of the shelter units is accomplished by hooking into the nearest point of electricity, primarily any TOWNSHIP or county street light that is located in close proximity to a shelter within the County. The COMPANY however will be responsible for all connection and utility costs.

14. AMERICANS WITH DISABLITES ACT. The COMPANY agrees that all shelters installed pursuant to the terms of the Contract will, at the time of their installation, conform with the requirements of the Americans With Disabilities Act (A.D.A."). The TOWNSHIP/County is responsible for curb cuts and sidewalk access. In the event of site changes initiated by the TOWNSHIP following the installation of a shelter, the party initiating such site changes will bear the expenses of any modifications required to bring the shelter into conformity with the requirements of the A.D.A

15. INDEPENDENT CONTRACTOR. The COMPANY and its agents shall be deemed to be an independent contractor, and not an agent or employee of the TOWNSHIP, and shall not attain any rights or benefits generally afforded classified or unclassified employees; further, the COMPANY's employees and agent shall not be deemed entitled to Workers Compensation benefits as employees of the TOWNSHIP.

16. SUCCESSORS AND ASSIGNS. This Contract shall be binding upon the parties herein, their heirs, executors, legal representatives, successors and authorized assign. Except with respect to an affiliated entity under control of the COMPANY, the COMPANY shall not assign or transfer the Contract without the prior written consent of the TOWNSHIP.

17. NOTICES. Any and all notice required under the Contract shall be deemed to have been given when placed in the United States mail, certified, return receipt requested, addressed as follows:

FOR COMPANY
Lamar Advertising of Penn, L.L.C.
d/b/a Lamar Advertising of Pittsburgh
740 Trumbull Drive
Pittsburgh, PA 15205

FOR TOWNSHIP
The Township of Robinson
1000 Church Hill Road
Pittsburgh, PA 15202-9006

or to such address as the parties may, in writing designate from time to time.

18. ENTIRE CONTRACT. This Contract contains all the terms and conditions agreed upon by the parties hereto and no other Contract, oral or otherwise, regarding the subject matter shall be deemed to exist to bind either of the parties hereto. Moreover, this Contract may not be modified or amended expect by a writing singed by both parties. Any and all modifications shall require written approval of the TOWNSHIP and the COMPANY.

19. GOVERNING LAW. The parties hereto agree that this Contract shall be construed and enforced according to the laws of the State of Pennsylvania.

20. OWNERSHIP OF SHELTERS. The bus shelters shall be the sole property of the COMPANY. However, COMPANY's ownership shall not include the land on which the shelters are situated. The COMPANY accepts all responsibility and liability associated with its ownership of the shelters. Should this agreement be terminated at the TOWNSHIP's insistence prior to the expiration of its terms for a reason other than COMPANY's default, then the TOWNSHIP shall reimburse COMPANY for its cost of purchase and freight for all materials remaining in service and/or on the premises in readiness for service, and parts thereto, and one and one-half time projected annual billing. At the termination of the Contract, and by whatever means this Contract shall terminate, it shall be the COMPANY's sole cost and obligation to remove said shelters and to repair the locations as previously provided in the agreement.

21. LIQUIDATED DAMAGES. The COMPANY shall pay the TOWNSHIP $100.00 per day in liquidated damages for a non-monetary material Default not cured within the required time frame set forth in Section 14 of this Contract. This liquidated damages provision shall not apply to the COMPANY's failure to pay fees as required by Section 2 hereunder. The liquidated damages shall accrue and be payable on a per diem basis until the Material Default is corrected. The imposition of liquidated damages is based on the inability of the parties to ascertain the losses the TOWNSHIP will suffer because of this non-monetary breach. In lieu of performance bond the COMPANY will use all installed shelters as collateral in place of bond. If there is a Material Default that is not corrected per the terms of the Contract, the TOWNSHIP has the right to possession of the installed units.

22. ATTORNEY'S FEES. The prevailing party in any litigation arising from the Contract shall be entitled to reasonable attorney's fees and costs.

23. The Township of Robinson warrants to the COMPANY it has the authority to enter into this Contract. The TOWNSHIP will use due diligence and will cooperate with the COMPANY to obtain permission to construct, maintain, market and administer the shelter program on the TOWNSHIP, County and State road right-of-ways for the COMPANY.

24. This agreement does not pertain to existing contracts, which the COMPANY has with any municipalities.

25. The COMPANY shall have in place a performance bond in the amount of $50,000, which shall remain in place for the duration of this contract to insure proper construction, operation, and maintenance, and removal of the shelters.

26. At the termination of this contract, and by whatever means this contract shall terminate, the COMPANY shall remove said shelters within 120 days and also be responsible for the costs involved to remove shelters and replace the location to its previous state.

IN WITNESS WHEREOF, the parties hereto have executed this Contract on the date any year first above mentioned and have agreed to be bound hereby.

Date: 6-26-17

WITNESS:,

ATTEST:

WITNESS:

ATTEST:

LAMAR ADVERTISING OF PENN, L.L.C. d/b/a Lamar Advertising of Pittsburgh

WITNESS:

ATTEST:

WITNESS:

ATTEST: